**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Susan Kettlewell, et al., | No. CV-25-00491-TUC-RM |
| Plaintiffs, | **ORDER** |
| v. | |
| Kristi Noem, et al., | |
| Defendants. | |

Pending before the Court are Plaintiffs' Motions for Preliminary Injunction. (Docs. 2, 13-1.) In the first Motion for Preliminary Injunction, Plaintiffs request that the Court enter a preliminary injunction enjoining the removal of the Plaintiff Children named in Plaintiffs' initial Complaint. (Doc. 2.) In the second Motion for Preliminary Injunction, Plaintiffs request that the Court enter a preliminary injunction enjoining the removal of the additional Plaintiff Children—four Guatemalan children and twelve Honduran children—named in Plaintiffs' Amended Complaint. (Doc. 13-1.) For the following reasons, the Court will grant both Motions for Preliminary Injunction.

**I.    Background**

Plaintiffs are fifty-seven Guatemalan and twelve Honduran nationals detained in Arizona—all of whom have allegedly been designated as unaccompanied alien children pursuant to 6 U.S.C. § 279(g)(2)[1]—and the Florence Immigrant and Refugee Rights

---

[1] Plaintiff Children allege that they are in two procedural postures in removal proceedings. Plaintiff Children 1-48, 57, and 59-69 are in removal proceedings which have not concluded. (Doc. 13 at 8.) Plaintiff Children 49-56 and 58 are not currently in removal proceedings. All except one lack valid removal or voluntary departure orders. (*Id.*)

Project. (Doc. 13.) Susan Kettlewell brings suit on behalf of the Plaintiff Children as their "next friend." (Docs. 13, 17-2.) Kettlewell is a retired Pima County Juvenile Court Commissioner, with extensive experience representing children in a variety of matters. (Doc. 17-2.) She asserts that she met with a group of Plaintiff Children after the commencement of this action. (*Id.*) Plaintiff Florence Immigrant and Refugee Rights Project is a non-profit organization providing legal and social services to detained adults and unaccompanied children facing immigration proceedings in Arizona, including Plaintiff Children. (*Id.* at 8.)

Plaintiffs allege that on the night of August 30, 2025, the Florence Immigrant and Refugee Rights Project learned that the execution of a plan by the Office of Refugee Resettlement to transport the Guatemalan Plaintiff Children back to Guatemala was imminent. (Doc. 13 at 16.) Believing that this transportation of the Guatemalan Plaintiff Children would constitute a violation of various federal laws, Plaintiffs filed a Complaint for Injunctive and Declaratory Relief (Doc. 1) and a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2). On August 31, 2025, the Court issued a Temporary Restraining Order, enjoining the removal of the Plaintiff Children named in the Complaint for Injunctive and Declaratory Relief. (Doc 7.)

On September 5, 2025, Plaintiffs filed an Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1), adding four more Guatemalan and twelve Honduran children as Plaintiffs and raising additional alleged violations of federal law. (Doc. 13.) Plaintiffs attached to the Amended Complaint a new Motion for Temporary Restraining Order and Preliminary Injunction, requesting that the Court enjoin the removal of the newly added Plaintiff Children. (Doc. 13-1.) In their new Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiffs argued that the removal of the additional Plaintiff Children would, like the removal of the original Plaintiff Children, constitute a violation of federal law. (Doc. 13-1.) On September 8, 2025, the Court issued a second Temporary Restraining Order, enjoining the removal of the newly added Plaintiff Children. (Doc. 14.)

On September 11, 2025, a hearing was held before the Court on Plaintiffs' Motions for Preliminary Injunction. (Docs. 2, 13-1.) At the hearing, the Court took Plaintiffs' Motions for Preliminary Injunction under advisement and extended the existing Temporary Restraining Orders, ordering that both remain in place until September 26, 2025. (Doc. 22.)

## II. Legal Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). A preliminary injunction is never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

A plaintiff seeking a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure must establish that (1) he is likely to succeed on the merits of his claim; (2) he is likely to suffer irreparable harm absent the preliminary injunction; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest. *See id.* at 20; *accord Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473, 481 (9th Cir. 2023). When a preliminary injunction is sought against the government, the balance of the equities and the public interest elements merge into one inquiry. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A likelihood, as opposed to a possibility, of irreparable harm absent the preliminary injunction is always required. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (discussing *Winter*, 555 U.S. 7 (2008)). Where the balance of the equities tips sharply in favor of the plaintiff, however, a showing of "serious questions" regarding the merits of a case can support the issuance of injunctive relief, so long as the other elements of the *Winter* test are also met. *Id.*

## III. Discussion

### a. Next-Friend Standing

The question of whether Plaintiffs are properly before this Court is a threshold matter and the Court will therefore address it first. This case comes before the Court on a

theory of next-friend standing. (Doc. 13 at 5.) Susan Kettlewell brings this case on behalf of Plaintiff Children, sixty-nine Guatemalan and Honduran minors that have been designated as unaccompanied alien children pursuant to 6 U.S.C. § 279(g)(2) and whom Defendants seek to transport out of the United States. (*Id.*)

Article III of the Constitution requires that every plaintiff in federal court demonstrate standing. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry determines whether the plaintiff is the proper party to invoke the power of a federal court. *Id.* Inherent in the standing inquiry is the principle that the plaintiff "generally must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). A person filing a claim in federal court must assert a personal injury in fact, with one narrow exception—next-friend standing. *Whitmore v. Arkansas*, 495 U.S. 149, 161-62 (1990). Under the doctrine of next-friend standing, a third party alleging no injury is allowed to bring suit on behalf of a real party in interest. *Id.* at 162.

The Federal Rules of Civil Procedure specify that "[a] minor or an incompetent person who does not have a duly appointed representative may sue by a next friend." Fed. R. Civ. P. 17(c). Next-friend standing is proper where: (1) the named party is a minor or incompetent person; and (2) the next friend has some significant relationship with, and is truly dedicated to the best interests of, the named party. *Whitmore*, 495 U.S. at 163; *Naruto v. Slater*, 888 F.3d 418, 421 (9th Cir. 2018).

"[T]he contours of the requisite 'significant relationship' do not remain static, but must necessarily adapt to the circumstances[.]" *Coal. of Clergy, Laws., & Professors v. Bush*, 310 F.3d 1153, 1162 (9th Cir. 2002). A putative next friend must therefore only demonstrate that his or her relationship to the real party in interest is significant in comparison to the real party in interest's other relationships. *Id.* In an extreme case, "it is plausible that a person with 'some' relationship conveying some modicum of authority or consent, 'significant' in comparison to the [real party in interest's] other relationships, could serve as next friend." *Id.*

Here, all Plaintiffs are minors; each is alleged to be between the ages of three and

seventeen, thereby satisfying the first requirement of next-friend standing. (Doc. 13 at 5.) Turning to the second requirement, Plaintiffs, as unaccompanied alien children, are by definition alone in this country. Examined in comparison to Plaintiffs' other relationships, Ms. Kettlewell has a significant relationship. She has decades of experience as an advocate for children and is a retired Pima County Juvenile Court Commissioner. (Doc. 17-2 at 1.) After the commencement of this action, Ms. Kettlewell met with a portion of the Plaintiff Children in order to discuss this litigation with them and receive their input. (*Id.*) She avers that she plans to continue meeting with Plaintiff Children as this case progresses, and to advocate for each child's individual best interest. (*Id.*)

In responding to Plaintiffs' arguments regarding next-friend standing, Defendants alternatively cite the Federal Rules of Civil Procedure and the Arizona Rules of Civil Procedure. (Doc. 15 at 13-14.) Defendants appear to argue that this Court should apply the Arizona Rules of Civil Procedure, which no longer provide for next-friend standing. But Defendants fail to explain why applying a state rule of procedure would be appropriate in this case. In federal court, "[t]he Federal Rules of Civil Procedure apply irrespective of the source of subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003) (*citing Hanna v. Plumer*, 380 U.S. 460, 460 (1965)). Here, there is a Federal Rule of Civil Procedure that is directly on point—Rule 17(c) clearly provides for next-friend standing in federal court.

The Court finds that Ms. Kettlewell has next-friend standing to bring this action on behalf of Plaintiff Children.[2]

### b. Likelihood of Success on the Merits

Plaintiffs argue that they are likely to prevail on their claim that the Trafficking Victims Protection Reauthorization Act ("TVPRA") entitles them to be placed in removal

---

[2] The Florence Immigrant and Refugee Rights Project is named as a plaintiff in this action in its own right; it is not alleged to be a next friend of Plaintiff Children. (Doc. 13.) The Court does not address the standing of the Florence Immigrant and Refugee Rights Project at this time, as doing so is not necessary for purposes of resolving the pending Motions for Preliminary Injunction.

proceedings under section 240 of the Immigration and Nationality Act ("INA"), and that they therefore cannot be summarily transported out of the United States. (Doc. 2 at 5, Doc. 13-1 at 5.) The Court finds that Plaintiffs are likely to succeed on this claim.

In relevant part, section 235 of the TVPRA states:

> Any unaccompanied alien child sought to be removed by the Department of Homeland Security . . . shall be—
> (i) placed in removal proceedings under section 240 of the Immigration and Nationality Act (8 U.S.C. 1229a);
> (ii) eligible for relief under section 240B of such Act (8 U.S.C. 1229c) at no cost to the child; and
> (iii) provided access to counsel in accordance with subsection (c)(5).

8 U.S.C. § 1232(a)(5)(D).

By the plain terms of the statute, any unaccompanied child sought to be removed from the United States by the Department of Homeland Security must be placed in removal proceedings under section 240 of the INA. *See id.* Once removal proceedings under section 240 have begun and the INA specifies no other proceedings, "a proceeding under [section 240] shall be the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States."[3] 8 U.S.C. § 1229a(a)(3).

Defendants counter that their objective in transporting Plaintiff Children out of the United States is not *removal*, but rather *reunification* of Plaintiff Children with family members located outside the United States. (Doc. 15 at 7-8.) Defendants contend that they possess statutory authority to reunify unaccompanied alien children that is distinct from the removal procedures prescribed by the TVPRA. (Doc. 15 at 9.) Defendants point to 6 U.S.C. § 279, which places with the Director of the Office of Refugee Resettlement responsibility for the care of unaccompanied alien children, and states that the Director "shall be responsible for . . . reuniting unaccompanied alien children with a parent abroad

---

[3] As discussed above, Plaintiff Children allege they are in two procedural postures in removal proceedings; the first group are in removal proceedings that have not concluded, and the second group are not in removal proceedings. As such, the first group of Plaintiff Children alleges that the INA entitles them to have their removal proceedings concluded prior to their removal. The second group of Plaintiff Children alleges that the TVPRA entitles them to be placed in removal proceedings, and that those proceedings must conclude prior to their removal.

in appropriate cases." 6 U.S.C. § 279(b)(1)(H).

Defendants' expansive interpretation of their authority under 6 U.S.C. § 279(b)(1)(H) is unsupported. As an initial matter, Defendants do not dispute that if unaccompanied alien children are to be removed from the United States, those children are protected by the TVPRA's requirement that they be placed in removal proceedings under section 240 of the INA. In that regard, the TVPRA is unequivocal. *See* 8 U.S.C. § 1232(a)(5)(D). Thus, Defendants' argument in support of their interpretation of the statutory scheme hinges on the difference between "removal" and "reunification." (*See* Doc. 15 at 9.) Defendants assert that "HHS is reuniting the Guatemalan UACs . . . with their parents and legal guardians" and although it is unquestionable that the children will no longer be in the United States after reunification abroad, Defendants contend that "[n]one are being removed." (Doc. 15 at 9-10.)

Regardless of whether a child is reunited with a family member once transported outside the United States, the child has departed, left, and changed location; in short, that child has been removed from the United States. Accordingly, when an unaccompanied alien child is transported out of the United States to be reunited with a family member, that child is simultaneously removed from the United States.

Moving beyond a reading of the plain text, pertinent case law also supports Plaintiffs' interpretation of the statutory scheme. The Ninth Circuit has termed section 240 proceedings under the INA "the standard removal process." *Guerrier v. Garland*, 18 F.4th 304, 306 (9th Cir. 2021). In addition, the Ninth Circuit has rejected the argument that the TVPRA was intended to give the Office of Refugee Resettlement, rather than immigration judges, full authority over the custody of unaccompanied minors. *Flores v. Sessions*, 862 F.3d 863, 880 (9th Cir. 2017). The Fifth Circuit has twice referred to the removal proceedings prescribed by the TVPRA for unaccompanied alien children as "mandatory." *Velasquez-Castillo v. Garland*, 91 F.4th 358, 363 (5th Cir. 2024); *Sanchez v. R.G.L.*, 761 F.3d 495, 500 (5th Cir. 2014) ("Because the children were declared by DHS to be 'unaccompanied alien children', they entered *mandatory* removal proceedings.")

(emphasis added).

In other district courts, there is also agreement that the procedural protections provided to unaccompanied alien children by the TVPRA are mandatory. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 121 (D.D.C. 2019) ("Under the TVPRA, an 'unaccompanied alien child' that the Department of Homeland Security seeks to remove from the United States is *entitled* to the procedural protections afforded by formal—as opposed to expedited—removal proceedings[.]") (emphasis added); *see also J.O.P. v. U.S. Dep't of Homeland Sec.*, No. GJH-19-1944, 2020 WL 2932922 at *3 (D. Md. June 3, 2020) ("Under the TVPRA, when DHS apprehends children that it determines are UACs and then seeks to remove them, DHS *must* place them in section 240 proceedings before transferring them to HHS custody.") (emphasis added); *Immigrant Defs. L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 21-0395 FMO (RAOX), 2025 WL 1191572 at *12 (C.D. Cal. Mar. 14, 2025) ("In other words, § 1232(a)(5)(D)(i) *entitles* "[a]ny unaccompanied alien child" to placement in § 240 proceedings.") (emphasis added).

In a case filed the same weekend as this one and raising identical issues, the District Court for the District of Columbia found that "Defendants cannot dodge their statutory obligations under the TVPRA by asserting that these children are being reunified or repatriated without being removed." *L.G.M.L. et al. v. Noem et al.*, No. 25-2942 (D.D.C. Memorandum Op. at 33, September 18, 2025).

The legislative history of the TVPRA, discussed by both parties, also firmly favors Plaintiffs' interpretation of the statutory scheme. "The overarching purpose of the [Homeland Security Act][4] and TVPRA was to give unaccompanied minors more protection, not less." *Flores*, 862 F.3d at 880. In passing the Homeland Security Act ("HSA"), Congress recognized that "[u]naccompanied minors deserve special treatment under our immigration laws and policies." 148 Cong. Rec. S8180 (daily ed. Sept. 4, 2002). "Nowhere does the legislative history of the HSA suggest that . . . Congress intended to

---

[4] Section 462 of the Homeland Security Act, 116 Stat. 2202, P.L. 107-296, contains the statutory text Defendants rely upon to support their argument that they possess the authority to reunify unaccompanied alien children separately from the removal procedures prescribed by the TVPRA. *See* 6 U.S.C. § 279(b)(1)(H).

reduce the rights already granted to unaccompanied minors." *Flores*, 862 F.3d at 880. The court in *Flores* went on to say:

> Similarly, in passing the TVPRA, Congress sought to improve the procedures governing the treatment of unaccompanied minors. . . As Senator Dianne Feinstein stated during the debate over the passage of the TVPRA, the Act represents an "important step to protecting unaccompanied alien children, the most vulnerable immigrants," and to fulfilling our nation's "special obligation to ensure that these children are treated humanely and fairly." 154 Cong. Rec. S10886 (daily ed. Dec. 10, 2008). To deprive unaccompanied minors of an opportunity to contest their detention before an immigration judge is hardly consistent with such Congressional intent.

*Id.*

Defendants' interpretation of the HSA and TVPRA would allow them to bypass review by an immigration judge, thereby stripping unaccompanied alien children of the very protection that Congress sought to give when enacting these statutes. *See id.* The HSA provision cited by Defendants as giving rise to a freestanding authority to reunify unaccompanied alien children with parents abroad is one sentence in a list of various responsibilities that were transferred to the Office of Refugee Resettlement after the Immigration and Naturalization Service ceased to exist. *See* 6 U.S.C. § 279(a) ("Transfer of Functions").

Even if Defendants have the reunification authority they claim, it is unclear whether Defendants' plan to transport Plaintiff Children back to their countries of origin would actually result in reunification of the children with their parents. During the September 11, 2025 hearing before the Court, when asked if there was any coordination "with at least one parent out of all these children," counsel for Defendants replied "[i]f it sounded like I was saying that we did anything to coordinate with the parents, that is not what I intended to say." (Transcript of Motion Hearing at 24, *Kettlewell et al. v. Noem et al.*, No. CV-25-00491-TUC-RM.) When asked if there was any "information that the Guatemalan official that you were speaking to had any coordination with a parent," counsel replied "[n]o." (*Id.*) The foundation of Defendants' argument for their authority to transport Plaintiffs out of the United States is that Defendants are reuniting Plaintiff Children with parents abroad,

but counsel could not identify a single instance of coordination between a parent and *any* government—American or Guatemalan.

In their Response to the Motion for Preliminary Injunction (Doc. 15), Defendants state several times that the Government of Guatemala requested the return of the unaccompanied alien children in this case, but statutory authority to conduct reunifications specifies that reunifications must be "*with a parent*." 6 U.S.C. § 279(b)(1)(H) (emphasis added). The Guatemalan Attorney General has issued a report stating that it conducted investigations into the families of 115 adolescents identified for potential transportation to Guatemala. (Doc. 20 at 5.) Fifty families stated that they would accept their children upon their return, but "with the caveat that none of them was requesting their return, indicating their desire to consider first the viability of the children staying in the United States." (*Id.* at 5-6.) Fifty-nine families expressed annoyance at being contacted and were not willing to be assessed to determine their suitability as a home for their children. (*Id.* at 6.) Altogether, whether Plaintiffs would actually be reunited with a parent upon being transported out of the United States is dangerously unclear.

For the foregoing reasons, the Court finds that Plaintiffs are likely to prevail on their claim that the TVPRA entitles them to be placed in formal removal proceedings and that once in removal proceedings, it is only upon valid order of an immigration judge that they may be removed from the United States. Since Plaintiffs' likelihood of success on the merits of this claim supports the requested preliminary injunctive relief, the Court will not address Plaintiffs' remaining claims at this time.

### c. Likelihood of Irreparable Harm

A preliminary injunction may not issue unless plaintiffs demonstrate a likelihood of irreparable harm absent the requested relief. *Cottrell*, 632 F.3d at 1131. The Court finds that Plaintiffs have demonstrated a likelihood of irreparable harm absent a stay enjoining their removal from the United States.

Where a noncitizen's removal prevents him from obtaining judicial review of his removal, irreparable harm is done. *Leiva-Perez v. Holder*, 640 F.3d 962, 962, 969 (9th Cir.

2011). It is only where an alien is removed pursuant to a valid removal order, and still has the chance to pursue a petition for review, that removal is not categorically irreparable. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). In *Nken*, the Court explained that prior to the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), removed aliens were not permitted to pursue petitions for review; "the petition abated upon removal." *Id.* After IIRIRA, however, removed aliens could continue to pursue their petitions for review, and those who prevailed could be "afforded effective relief by facilitation of their return." *Id.* The Court reasoned that in light of the new statutory scheme, removal pursuant to a valid removal order while a petition for review remained pending no longer constituted an irreparable injury. *Id.*

Here, all but one of the Plaintiff Children lack valid removal orders,[5] and it is unclear whether they could obtain judicial review of their removal if it occurred, much less "facilitation of their return" as discussed by the Court in *Nken*. After IIRIRA, a petition for review can be pursued while a removed alien is abroad, but this requires that there be a removal order to review. Since Plaintiff Children's summary removal from this country would likely deprive them of the opportunity for judicial review, they have alleged an irreparable injury.

Plaintiff Children have further demonstrated that there is a likelihood of this injury occurring in the absence of a stay enjoining their removal from the United States. Defendants do not dispute that they seek to transport at least some of the Plaintiff Children out of the United States, and that they undertook rapid efforts to do so close to midnight on August 30, 2025, and continuing into the very early hours of August 31, 2025. (Docs. 13, 15.) Defendants argue that, if the Court issues injunctive relief, the relief should be limited to Plaintiff Children that Defendants identified as potentially appropriate for reunification with a parent in Guatemala. (Doc. 15 at 15.) However, due to the obscurity of the standards that Defendants have employed in deciding which Plaintiffs could be appropriate for reunification, the Court finds that there is a likelihood of irreparable harm

---

[5] Plaintiffs allege that one Plaintiff Child has a pending motion to reopen his removal proceeding and that his removal is stayed for the pendency of that motion. (Doc. 13 at 9.)

as to all Plaintiffs. Director of the Office of Refugee Resettlement Angie Salazar lists nine criteria that she asserts were employed in determining whether a child could be a candidate for reunification, but these criteria are part of no statute or regulation and could be subject to swift change. (Doc. 15-1 at 4.)

Moreover, Defendants' application of the criteria does not appear to be consistent. Defendants assert that one of the requirements for reunification eligibility was "[c]hild does not have indications of child abuse/neglect perpetrated by a parent/legal guardian." (Doc. 15-1 at 4.) But according to the report by the Attorney General of Guatemala, fifty-nine potential families rejected the Guatemalan Government's request to assess their suitability as a home for their children. (Doc. 20 at 6.) Other criteria included "[c]hild does not have a credible fear claim" and "ORR is assured the child will not be trafficked upon their return." (Doc. 15-1 at 4.) A recent letter submitted to Senators on the Subcommittee on Border Security and Immigration, however, raises concerns that Defendants' own data indicated that children identified as candidates for reunification could be subject to abuse, violence, or human trafficking. (Doc. 27-1 at 2.) Another element of reunification eligibility was "[t]he child's attorney of record has not affirmatively protested the child's reunification with their parent (or legal guardian) in Guatemala" but Plaintiffs allege that attorneys were given only hours, if not minutes, of notice before Defendants' reunification plans were put in motion. (Doc. 13-7 at 6.) During the hearing before the Court on September 11, 2025, counsel for Defendants admitted that "[t]he notice went out in the middle of the night." (Transcript of Motion Hearing at 22, *Kettlewell et al. v. Noem et al.*, No. CV-25-00491-TUC-RM.)

The above concerns apply equally to the Honduran Plaintiff Children in this case, and they have also demonstrated a likelihood of irreparable harm absent a stay enjoining their removal from the United States. Office of Refugee Resettlement Director Angie Salazar avers that there are "no imminent plans to repatriate Honduran unaccompanied alien children," (Doc. 19-1 at 1) but the lack of an imminent plan means little when Defendants' past actions demonstrate that efforts to transport unaccompanied alien

children out of the country may occur in the middle of the night and with only hours or minutes of notice. Moreover, an article published by the Honduran Foreign Ministry describes preparations being made for the return of unaccompanied Honduran minors removed from the United States, with one official referencing the need to "address situations like the one experienced in Guatemala." (Doc. 13-10 at 2.) The Deputy Director of the Florence Immigrant and Refugee Rights Project asserts that two Honduran children had interviews with Honduran Consulate officials in which return to Honduras was discussed. (Doc. 13-7 at 6.) The Deputy Director also alleges that Homeland Security Investigations has conducted interviews with a number of Honduran children, which she further alleges is the same pattern that occurred before the attempted removal of Guatemalan children over the weekend of August 30, 2025. (*Id.* at 7.)

Because removal would deprive Plaintiffs of judicial review and because this injury is likely to occur absent the requested relief, the Court finds that Plaintiffs have adequately demonstrated the requisite likelihood of irreparable harm.

### d. Balance of Equities and the Public Interest

Since the injunction sought in this case is against the government, the balance of the equities and the public interest elements merge into one inquiry. *Nken*, 556 U.S. at 435. That inquiry favors the issuance of preliminary injunctive relief. First, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Furthermore, "there is a public interest in preventing aliens from being wrongfully removed." *Nken*, 556 U.S. at 436. The relief sought merely preserves the status quo and prevents a practice that Plaintiffs have demonstrated is likely unlawful.

The Court also notes that Plaintiffs are children and therefore particularly vulnerable. As discussed above, there is a marked lack of clarity concerning the circumstances that Plaintiffs would encounter upon their removal from the United States. In addition, certain plaintiffs are alleged to have specialized medical needs, which weighs in further support of their remaining in Office of Refugee Resettlement care and custody.

(Doc. 13 at 18.) Other plaintiffs are alleged to have particular fears regarding return to Guatemala, including the fear that no one is available to take custody of them if they were to return. (*Id.*)

As such, the Court finds that the balance of equities and the public interest tips sharply in favor of Plaintiffs.

**IV.     Bond**

The Federal Rules of Civil Procedure state that a preliminary injunction may only issue where the "movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). District courts are "afforded wide discretion in setting the amount of the bond." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). The bond amount may be zero if there is no evidence that the party against whom an injunction is entered will suffer damages. *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000).

Here, the parties have not addressed a bond amount they consider proper. Since the Court finds that Defendants are unlikely to suffer harm as a result of a stay enjoining them from removing Plaintiff Children from the United States, the Court will set the bond amount at zero.

**V.     Conclusion**

For the foregoing reasons, the Court finds that Plaintiffs have established a likelihood of success on the merits, a likelihood of irreparable harm absent the requested relief, and that the balance of equities and the public interest tip sharply in their favor.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 2) and Motion for Preliminary Injunction Regarding 12 Honduran Unaccompanied Children and 4 Additional Guatemalan Unaccompanied Children (Doc. 13-1) are **granted**.

. . . .

. . . .

**IT IS FURTHER ORDERED** that Defendants are enjoined from removing Plaintiff Children from the United States pending further Order of the Court. No bond is required. This Order prohibits the repatriation or removal of any Plaintiff Child without a valid voluntary departure order or removal order issued by an immigration judge.

Dated this 25th day of September, 2025.

_____
Honorable Rosemary Márquez
United States District Judge

- 15 -